# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

HELEN THOMPSON; and WILLIAM
THOMPSON,

             Plaintiffs,

    v.

THE UNITED STATES OF AMERICA,

             Defendant.

CIVIL ACTION NO. 4:17-cv-63

## O R D E R

This matter is before the Court on Defendant's Motion to Exclude Expert Testimony and for Partial Summary Judgment. (Doc. 15.) Plaintiffs responded in opposition, (doc. 21), and Defendant filed a Reply, (doc. 23). For the reasons and in the manner set forth below, the Court **GRANTS** Defendant's Motion to Exclude Expert Testimony and for Partial Summary Judgment. (Doc. 15.)

## BACKGROUND

Plaintiffs brought this Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq.* ("FTCA"), case on March 31, 2017, for injuries Plaintiff Helen Thompson ("Plaintiff" or "Mrs. Thompson") allegedly suffered due to an accident involving a United States Postal Service mail truck. (Doc. 1.) Plaintiffs allege that, on November 24, 2014, a mail truck backed into Mrs. Thompson's right side, knocking her to the ground, as she was retrieving her mail. (Id.) An ambulance arrived at the scene and took Mrs. Thompson to Memorial Health University, where she principally complained of pain to her right arm. (Doc. 15-15, p. 2; doc. 21-2, p. 2.) There she was diagnosed with contusions of her right shoulder, knee, and chest wall, as well as a knee abrasion; Mrs. Thompson

later determined that she also injured her head and has scarring as a result, although at the time of the incident she did not believe that she had hit her head.[1] (Id.; see also doc. 15-3.) Prior to this incident, Mrs. Thompson had never experienced any right shoulder pain or reduced range of motion, nor had she ever experienced any of the difficulties with balance that she later developed. (Doc. 21-1, p. 2.)

One week after the accident, Mrs. Thompson saw an orthopedist who referred her for an MRI. (Doc. 15-15, p. 2; doc. 21-2, p. 2.) The MRI, performed on December 12, 2014, revealed a massive rotator cuff tear involving the supraspinatus and infraspinatus tendons. (Id.) Dr. James Wilson, Jr., an orthopedic surgeon specializing in shoulders, reviewed the MRI and determined that Mrs. Thompson, as an 81-year-old, "likely had some degree of rotator cuff tearing in the supraspinatus tendon but when she fell over split it further." (Id.; doc. 15-5, p. 5.) During December of 2014, Mrs. Thompson also saw her primary care physician—and challenged expert witness in this case—Dr. Roland Summers on four different occasions. (Doc. 15-15, p. 3; doc. 21-2, p. 3.) While Dr. Summers did not personally provide any individual treatment for Mrs. Thompson's shoulder injury, he did ensure "she got to the right people and got care."[2] (Doc. 21-2, p. 2.) He has opined that being struck and knocked down by a mail truck "caused or at least contributed to" Mrs. Thompson's torn rotator cuff. (Doc. 21-1, p. 4.)

---

[1] Mrs. Thompson reported on February 27, 2017, while undergoing a medical evaluation, that she did not believe her head struck the ground when she fell on her right side and injured her right rotator cuff, after being struck by the mail truck. (Doc. 15-10, p. 2.) Nevertheless, she later testified at her deposition that the fall caused her head to hit the ground, which left a scar near her left temple. (Doc. 15-1, pp. 21–22.)

[2] Mrs. Thompson's rotator cuff tear was treated with physical therapy until she eventually had a shoulder replacement surgery in June of 2015 under the care of Dr. Mark Mighell, an orthopedic surgeon at Florida Orthopedic Institute. (Doc. 15-15, p. 2; doc. 21-2, p. 2.) At his deposition, Dr. Mighell testified, "I would state, within a reasonable degree of medical certainty, that [the mail truck event] did, in fact, cause [Mrs. Thompson's] shoulder injury" and need for replacement surgery. (Doc. 21-1, p. 12.) Defendant does not challenge Dr. Mighell's conclusions.

On January 28, 2015, just over two months after the accident, Plaintiff sought treatment from Dr. Summers for unsteadiness and staggering when changing positions, which she had been experiencing over the prior three to four weeks. (Doc. 15-5, p. 3; doc. 21-2, p. 3.) Mrs. Thompson had not complained of these symptoms during her four December 2014 visits with Dr. Summers. (Id.) Dr. Summers was unclear as to the etiology of Mrs. Thompson's symptoms, but thought she might be suffering from a form of labyrinthine irritation, or a cerebellar lesion, or possibly gadolinium toxicity, and he ordered a brain MRI to further understand the cause of her symptoms. (Id.) He also prescribed Mrs. Thompson Antivert, a medication to help her deal with her balance problems. (Id.) Early medical records show that Dr. Summers initially believed she was suffering from labyrinthitis; these records also show that Mrs. Thompson's condition improved with continued Antivert prescriptions. (Id.) After the MRI revealed no significant findings, Dr. Summers referred Mrs. Thompson for an electronystagmogram ("ENG") on February 3, 2015, to further investigate the source of her inability to keep her balance. (Id.) The record is unclear as to the results of Mrs. Thompson's ENG, but following this diagnostic test Dr. Summers had Mrs. Thompson undergo further diagnostic testing in the form of an audiometric and videonystagmograph ("VNG"). Like with Mrs. Thompson's rotator cuff tear, Dr. Summers opined that her fall caused, or at least contributed to, the balance difficulties she began experiencing. (Doc. 21-1, p. 4.)

On February 27, 2017, Mrs. Thompson underwent the VNG at St. Joseph's/Candler, which revealed right peripheral vestibular weakness, right posterior canal benign paroxysmal positional vertigo ("BPPV" or "vertigo"), and hearing loss. (Doc. 15-5, p. 3; doc. 21-2, p. 3.) Mrs. Thompson returned to see Dr. Summers on March 2, 2015, and he referred her to Dr. J. Robert Logan, an otolaryngologist, for vestibular rehabilitation to treat her BPPV. (Doc. 15-15, p. 4; doc. 21-2, p. 3.)

In addition to vestibular rehabilitation, Dr. Logan preformed an Epley maneuver—involving manipulation of the ear and body—to flush out microscopic particles from Mrs. Thompson's ear canal and return the fluid there to a normal weight. (Id.) After attending a single therapy session on March 23, 2015, Mrs. Thompson temporarily moved from the Savannah area but expressed that she would follow up upon her return if needed. (Id.) However, there is no record that Mrs. Thompson sought any further treatment related to her vertigo diagnosis. (Id.)

## DISCUSSION

### I.     Motion to Exclude Expert Testimony of Dr. Summers (Doc. 15)

Dr. Summers is Mrs. Thompson's longtime primary care physician, who has seen her on a regular basis approximately every three months for the last few years. (Doc. 21-1, p. 4.) Following the mail truck accident on November 24, 2014, Mrs. Thompson first visited Dr. Summers on December 9, 2014. (Doc. 15-15, p. 3; doc. 21-2, p. 3.) As described above, she saw him for several follow-up appointments thereafter regarding treatment for her injuries. Based on his practice experience, training, treatment of Mrs. Thompson, and the information she offered him, Dr. Summers testified that he believes, to a reasonable degree of medical certainty, that her being struck and knocked down by the mail truck "caused or at least contributed to" her torn rotator cuff and vertigo. (Doc. 15-8, p. 26.)

Defendant argues that Dr. Summers' expert testimony on the cause of Mrs. Thompson's rotator cuff injury and vertigo should be excluded for two reasons: 1) Dr. Summers lacks the necessary qualifications to opine on the cause of these conditions; and 2) Dr. Summers did not support his causation opinions as to these conditions with reliable methodology. (Doc. 15, pp. 5–19.) As such, Defendant contends Dr. Summers' proposed expert testimony fails to satisfy the expert evidentiary demands as set forth by the United States Supreme Court in Daubert. Further,

regarding the torn rotator cuff specifically, Defendant argues Dr. Summers' testimony as a treating physician should be excluded because he was not retained as an expert and his opinion exceeds the scope of his treatment. (Id. at pp. 14–15.)

In response, Plaintiffs contend Dr. Summers had a sufficiently reliable basis upon which to form an admissible opinion. (Doc. 21-1, pp. 8–10.) Plaintiffs point to his training, certifications, and experience with similar cases. (Id.) Moreover, Plaintiffs argue Dr. Summers' causation opinions were not solely based on the close temporal relationship between the mail truck accident and Mrs. Thompson's injuries; they contend Dr. Summers considered his firsthand observations, the reliability and specificity of Mrs. Thompson's statements, results of her MRI, that she struck her head, his test of her for lateral horizontal nystagmus, her positive response to his Antivert prescription, and his role in referring her to other doctors. (Id.) Plaintiffs additionally aver that Dr. Summers' opinions were properly limited to his care and treatment of Mrs. Thompson and thus not subject to the expert disclosure requirements of Federal Rule of Civil Procedure 26. (Id.)

In its Reply, Defendant reiterates Dr. Summers' causation opinions should be excluded for a lack of a reliable basis, because they improperly rely on temporal proximity. (Doc. 23, pp. 2–4.) Defendant also contends that, notwithstanding Dr. Summers' treatment of Mrs. Thompson, his opinions as to causation exceed the scope of permissible lay testimony and must satisfy the demands of Daubert and Federal Rule of Evidence 702, regardless of Federal Rule of Civil Procedure 26. (Id. at pp. 1–2.) Defendant avers Dr. Summers' testimony cannot meet these demands, despite Plaintiffs' attempts to discern additional factors from Dr. Summers' deposition in support of his causation opinions. (Id. at pp. 2–4.)

## A.    Legal Standard

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the United States Supreme Court interpreted Federal Rule of Evidence 702 ("Rule 702"), which governs expert testimony.  The Supreme Court stated that Rule 702 "compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert *scientific* evidence."  United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (emphasis in original) (citing Daubert, 509 U.S. at 589 n.7, 597).  The Supreme Court later held that "Daubert's general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (citing Fed. R. Evid. 702). Having adopted these decisions, amended Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court of Appeals for the Eleventh Circuit has established a three-pronged inquiry encompassing the requirements of Daubert and its progeny and Rule 702.  Under this inquiry, a court determining the admissibility of expert testimony must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is

> sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Frazier</u>, 387 F.3d at 1260 (citations omitted). The proponent of the expert opinion bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence. <u>Daubert</u>, 509 U.S. at 592, n.10. The ultimate objective of a court's <u>Daubert</u> gatekeeping function is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire</u>, 526 U.S. at 152.

For the first prong, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." <u>Frazier</u>, 387 F.3d at 1260–61; <u>see also</u> Fed. R. Evid. 702 (A witness may be qualified as an expert by "knowledge, skill, experience, training, or education."). In determining qualification, courts generally look to a proposed expert's education and experience and ask whether the witness's intended testimony is sufficiently within his or her area of expertise. <u>Maiz v. Virani</u>, 253 F.3d 641, 665 (11th Cir. 2001). However, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable <u>any</u> conceivable opinion the expert may express." <u>Frazier</u>, 387 F.3d at 1261 (emphasis in original).

Consequently, the second prong, reliability, "remains a discrete, independent, and important requirement for admissibility." <u>Id.</u> The Supreme Court in <u>Daubert</u> "set out a list of 'general observations' for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." <u>United States v. Brown</u>, 415 F.3d 1257, 1267 (11th Cir. 2005) (citation omitted). These factors or observations inquire into the expert's "theory or technique" and are:

"(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." Id. (citation omitted). "Sometimes the specific <u>Daubert</u> factors will aid in determining reliability; sometimes other questions may be more useful. As a result, 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" <u>Frazier</u>, 387 F.3d at 1262 (quoting <u>Kumho Tire</u>, 526 U.S. at 152). "Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" Id. at 1261 (emphasis in original).

Third, expert opinion testimony must assist the trier of fact. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." Id. at 1262 (citation omitted). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. <u>Cook v. Sheriff of Monroe Cty.</u>, 402 F.3d 1092, 1111 (11th Cir. 2005).

Lastly, treating physicians, such as Dr. Summers, must satisfy these requirements when their testimony goes beyond discussing their treatment and diagnosis of a patient and extends into the fields of causation and etiology. <u>United States v. Henderson</u>, 409 F.3d 1293, 1300 (11th Cir. 2005) (citations omitted) (treating physician's diagnosis of jaw fracture is permissible lay opinion but statement as to cause of fracture was expert opinion); <u>see also</u> <u>Wilson v. Taser Int'l, Inc.</u>, 303 F. App'x 708, 712 (11th Cir. 2008) ("Although we agree that a treating physician may testify as a lay witness regarding his observations and decisions during treatment of a patient, once the treating

physician expresses an *opinion* unrelated to treatment which is 'based on scientific, technical, or other specialized knowledge,' that witness is offering expert testimony for which the court must perform its essential gatekeeping function as required by <u>Daubert</u>.") (per curiam) (emphasis in original); <u>Rangel v. Anderson</u>, 202 F. Supp. 3d 1361, 1364 (S.D. Ga. 2016) ("Treating physicians not disclosed as experts are limited to testimony based on personal knowledge and may not testify beyond their treatment of a patient.").

> **B. Dr. Summers' Opinion That the Mail Truck Incident Caused Mrs. Thompson's Vertigo**
>
> > **(1) Whether Dr. Summers is Qualified to Opine on the Cause of Mrs. Thompson's Vertigo**

Defendant asserts that because Dr. Summers lacks adequate training, skill, and experience in the field of otolaryngology, he does not have the qualifications to opine on the cause of Mrs. Thompson's vertigo. (Doc. 15, pp. 7–8.) Plaintiffs argue that Dr. Summers' more than forty years of professional experience and general medical training qualify him to give this opinion, (doc. 21-1, pp. 4, 9), but Defendant counters that a medical degree does not qualify a doctor to opine on causation without some degree of specialized knowledge, (doc. 15, p. 8).

Although the Eleventh Circuit has not held that physicians must have a specialty in the relevant field to qualify as an expert, the area of the witness's expertise must align with the subject matter of the witness's testimony. <u>See</u> <u>United States v. Paul</u>, 175 F.3d 906, 912 (11th Cir. 1999) (excluding law professor's handwriting analysis testimony, even though the professor had written on the topic, because his relevant expertise as a lawyer "did not make him any more qualified to testify as an expert on handwriting analysis than a lay person who read the same articles"); <u>accord</u> <u>Berry v. City of Detroit</u>, 25 F.3d 1342, 1351 (6th Cir. 1994) ("The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications

provide a foundation for a witness to answer a specific question."). Furthermore, general expert knowledge may form a sufficient basis for testimony concerning related applications. United States v. Wen Chyu Liu, 716 F.3d 159, 168–69 (5th Cir. 2013) (expert witnesses not "strictly confined" to practice area); United States v. Hensel, 711 F.2d 1000, 1006 (11th Cir. 1983) (expert witness with extensive experience investigating fires on land may testify as expert concerning shipboard fire). A medical degree, however, does not qualify a physician to testify concerning *any* medical issue; a physician's expert testimony must stay within the "reasonable confines" of his or her practice area. Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 (10th Cir. 2001).

Dr. Summers holds undergraduate degrees from Johns Hopkins University (biological sciences) and the University of South Dakota (medicine) and a medical degree from Northwestern University. (Doc. 15-13, p. 2.) He has been in active practice since 1974 and has specialized training and qualifications in the fields of pulmonary diseases and internal medicine. (Id. at pp. 2–3.) Further, Dr. Summers has written several published articles in these fields. (Id. at pp. 3–4.) He currently practices internal medicine in the Savannah area and is a professor of medicine at the Medical College of Georgia as well as the Mercer University School of Medicine. (Id.; doc. 15-8, p. 5.) With respect to vertigo, Dr. Summers, as an internist, has some experience in diagnosing and treating vertigo patients, but he admittedly does not have the specialized knowledge in this area of medicine that an otolaryngologist would have. (Doc. 15-8, pp. 27–28.)

Although Dr. Summers has expertise in the diagnosis and treatment of vertigo, "[t]he ability to diagnose medical conditions is not remotely the same . . . as the ability to deduce . . . in a scientifically reliable manner, the causes of those medical conditions." Tamraz v. Lincoln Elec. Co., 620 F.3d 665, 673 (6th Cir. 2010). Thus, the question becomes whether the above-detailed qualifications and experience of Dr. Summers provide a foundation for him to opine on the cause

of Mrs. Thompson's vertigo, not whether his background qualifies him to properly classify her imbalance symptoms as BPPV. Dr. Summers is undoubtedly qualified to testify that Mrs. Thompson suffered from BPPV, rather than a different type of vertigo or a different condition entirely, and Dr. Summers is also qualified to testify generally about his treatment of Mrs. Thompson for vertigo. However, "more specific knowledge is required to support [his] more specific opinion[]" that the mail truck incident was the cause of Mrs. Thompson's condition. Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 322 (3rd Cir. 2003). Plaintiff points to no specific knowledge or experience held by Dr. Summers that would qualify him to opine on the cause of Mrs. Thompson's vertigo in this case. Moreover, at his deposition, Dr. Summers conceded that he would "absolutely" defer to Dr. Logan,[3] the otolaryngologist to whom he referred Mrs. Thompson for vertigo treatment, if Dr. Logan disagreed with him on the cause of Mrs. Thompson's vertigo. (Doc. 15-8, pp. 28–29.)

Dr. Logan went on to testify that a "large percentage of people [with BPPV] are idiopathic," meaning they experience the condition spontaneously or without a known cause, and he noted that difficulty exists in determining the cause of a particular patient's BPPV far after a putative impetus occurred. (Doc. 15-9, pp. 24–25.) Dr. Logan ultimately concluded that, based on his knowledge and his having seen Mrs. Thompson weeks after the mail truck incident, he could not determine within a reasonable degree of medical certainty whether Mrs. Thompson's BPPV was idiopathic or resulted from acute trauma. (Id.) Furthermore, Dr. Summers initially characterized Mrs. Thompson's imbalance condition as labyrinthitis, a diagnosis he considered to be interchangeable

---

[3] Dr. Logan is an otolaryngologist practicing at the Georgia Ear Institute who has decades of specialized knowledge and experience related to BPPV. (Doc. 15-15, p. 4; doc. 15-8, pp. 27–29.) Dr. Logan evaluated Mrs. Thompson after she complained to Dr. Summers of difficulty keeping her balance. (Doc. 15-15, p. 4.) After his evaluation, Dr. Logan confirmed Mrs. Thompson's BPPV diagnosis and provided her treatment. (Id.; see also doc. 15-9, pp. 6–8.)

with BPPV.  (Doc. 15-8, p. 12.)  Dr. Logan, however, disagreed with this understanding and explained that labyrinthitis is an inflammatory disease of the inner ear, caused by either a virus or bacteria, with treatments that are materially different from those for BPPV.  (Doc. 15-9, p. 17.) Dr. Logan even stated that it would be a "far reach" to conclude, as Dr. Summers did, that a trauma event caused labyrinthitis.  (Id. at p. 36.)

Given that Plaintiffs point to nothing more than Dr. Summers' general education, training, and experience as a medical doctor, and also considering the discrepancies between Dr. Summers' understandings of ear disorders as compared to Dr. Logan's, the Court finds that Plaintiffs have failed to carry their burden of establishing that Dr. Summers is qualified to opine as to the cause of Mrs. Thompson's BPPV.  See Murphy v. Precise, No. 1:16-CV-143-WKW-DAB, 2017 WL 1632870, at *7 (M.D. Ala. Apr. 28, 2017) (long-term general practitioner not qualified to testify as to causation where he had no specialized experience and would defer to a neurologist on the issue); Everett v. Georgia-Pac. Corp., 949 F. Supp. 856, 858 (S.D. Ga. 1996) (family doctor not qualified to opine on the causation of bronchitis where he had no specialized training or experience in toxicology).  Although the Court does not doubt Dr. Summers' general medical knowledge and clinical experience, it has not been specialized in otolaryngology or the study and treatment of vertigo.  (See Doc. 15-8, p. 5.)  In his practice as a pulmonary internist, Dr. Summers does not regularly see patients with vertigo and, when he does, he refers them to an otolaryngologist for complex matters.  (See id. at pp. 27–28.)  Moreover, Dr. Summers expressly stated that he would yield to Dr. Logan's causation conclusions regarding Mrs. Thompson's vertigo; this deference demonstrates that he is not specifically qualified to opine on the cause of Mrs. Thompson's vertigo. While Dr. Summers is qualified to testify regarding his diagnosis and treatment of Mrs.

Thompson's vertigo, he lacks sufficient qualifications to opine on the underlying cause of this condition.

### (2) Whether Dr. Summers Employed a Reliable Methodology in Making his Vertigo Causation Opinion

Even if Dr. Summers' considerable training and experience as an internal medicine doctor qualified him to opine on the cause of Mrs. Thompson's BPPV, his expert testimony in this regard would still be excluded due to a lack of reliable basis for his conclusion. At his deposition, Dr. Summers testified to the following regarding the support for his opinion that Mrs. Thompson's fall from the mail truck impact caused her vertigo:

> Q: So other than Mrs. Thompson's report of when her symptoms began, what other evidence supports a fall or accident described by Mrs. Thompson as the cause of the vertigo?
>
> A: The fact that she hadn't had it before.
>
> Q: So, it's simply she reported the symptoms after this [incident] and didn't have them before?
>
> A: Yes.
>
> Q: Anything else?
>
> A: Not that I recall.

(Doc. 15-8, p. 29.) Defendant argues this testimony does not meet Rule 702's reliability criterion because it rests on the *post hoc ergo propter hoc* logical fallacy. (Doc. 15, p. 10.) Plaintiffs respond that Dr. Summers pointed to several other factors at his deposition which influence his causation opinion. (Doc. 21-1, p. 10.) However, Dr. Summers' own testimony unequivocally states that he relied on the timing of the onset of Mrs. Thompson's imbalance symptoms, which occurred at least four weeks after the mail truck accident, as the sole basis for his causation opinion. The other factors Plaintiffs cite were indeed mentioned by Dr. Summers, but they relate more so

to his diagnosis of Mrs. Thompson's vertigo rather than to his understanding of the condition's root cause.

Generally speaking, a temporal relationship between an incident and symptoms, alone, is not a sufficient basis or methodology under <u>Daubert</u> to support a causation opinion. <u>See</u> <u>McClain v. Metabolife Int'l, Inc.</u>, 401 F.3d 1233, 1243 (11th Cir 2005) ("Drawing a [causation] conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy[, which] assumes causality from temporal sequence. . . . It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship."). Something more than "the fact that she hadn't had it before" is required to form a reliable opinion on the causation of vertigo, a condition with an apparently difficult etiology. (<u>See</u> Doc. 15-9, pp. 23–25 (Dr. Logan noting that "we don't know exactly what is the most common cause of [BPPV]," that it is often "idiopathic," that acute impacts inconsistently play a role in causing BPPV, and that he could not reliably opine as to the role the mail truck incident had in causing Mrs. Thompson's BPPV since more than three months had passed between the incident and his treatment).) Dr. Summers himself was unsure about the etiology of Mrs. Thompson's BPPV and initially misdiagnosed her condition as labyrinthitis, even though fall trauma does not usually cause labyrinthitis. This discrepancy exemplifies the unreliable nature of relying solely on a five-to-six-week temporal connection between the mail truck incident and Mrs. Thompson's symptoms in reaching a causation opinion.

Moreover, while Plaintiffs identify several other factors Dr. Summers mentioned at his deposition—the reliability and specificity of Mrs. Thompson's medical communications as a patient, her negative MRI and nystagmus tests, her positive response to Antivert, and his referrals to other doctors, (doc. 21-1, p. 10)—Dr. Summers' own testimony in this regard was clear: his

causation opinion depends entirely on the fact that Mrs. Thompson had not experienced vertigo prior to the incident. Plaintiffs cannot now controvert that admission by pointing to these potential additional factors. Further, none of these factors directly speaks to the cause of Mrs. Thompson's vertigo. For example, a positive response to prescribed medication indicates a correct diagnosis but does not necessarily indicate an accurate conclusion regarding the underlying cause of the diagnosis. Likewise, negative MRI and nystagmus test results help to determine diagnosis, but they have little effectiveness in determining causation. Furthermore, Mrs. Thompson being a reliable and specific patient concerns the credibility of what she says and does in her doctor-patient relationship with Dr. Summers, not the cause of her BPPV. As such, even accounting for these other factors, the Court finds that Plaintiffs fail to carry their burden of establishing that Dr. Summers' vertigo causation opinion stems from sufficiently reliable methodologies and information. Dr. Summers' lack of a reliable methodology provides an additional, independent ground to exclude his opinion.

Accordingly, the Court **GRANTS** this portion of Defendant's Motion to Exclude Expert Testimony. (Doc. 15.) Based on the above review of Dr. Summers' qualifications and methodologies, the Court finds that he may not testify as to the cause of Mrs. Thompson's vertigo. Any such opinion testimony will be precluded at trial.

### C. Dr. Summers' Opinion That the Mail Truck Incident Caused Mrs. Thompson's Rotator Cuff Tear

As with Dr. Summers' proposed vertigo testimony, Defendant contends Dr. Summers' testimony that the mail truck incident caused Mrs. Thompson's rotator cuff tear should be excluded because he lacks the necessary qualifications to make such an opinion and because he employed unreliable methodologies in reaching that conclusion. (Id. at pp. 7–14.) Defendant also argues such testimony should be excluded because Dr. Summers did not treat Mrs. Thompson's rotator

cuff injury and he was not properly disclosed as an expert. (Id. at pp. 14–15.) In their Response, Plaintiffs argue the training and experience detailed above qualifies Dr. Summers to give this opinion and that it rests on a sufficiently reliable basis. (Doc. 21-1, pp. 2–4, 9.) Plaintiffs argue further that Dr. Summers' opinion about the rotator cuff tear should be admitted notwithstanding any failure to comply with expert disclosure requirements because he was Mrs. Thompson's treating physician. (Id. at pp. 8–9.)

Pretermitting the rotator cuff opinion, qualification and methodology issues—to which Plaintiffs give scant attention[4]—the Court finds that Dr. Summers' opinion regarding the cause of Mrs. Thompson's rotator cuff injury must be excluded because he was neither a treating physician for that injury (much less a treating physician that reached a conclusion regarding the cause of the injury during the course of treatment) nor a properly disclosed expert. The Court's review of Dr. Summers' records and deposition testimony, as well as other pertinent medical records, shows that he did not personally evaluate or treat Mrs. Thompson's torn rotator cuff. Therefore, as explained

---

[4] Plaintiffs almost exclusively focus their response brief on Dr. Summers' challenged vertigo opinion and fail to specifically grapple with Defendant's rotator cuff opinion arguments. (See Doc. 21-1.) Beyond pointing out that Dr. Mark Mighell, Mrs. Thompson's surgeon and Defendant's designated expert, agrees with Dr. Summers' opinion that the mail truck incident caused Mrs. Thomson's rotator cuff injury, (id. at pp. 9, 12), Plaintiffs are mostly silent regarding Dr. Summers' qualifications and methodologies for this opinion. It is the parties' "onus . . . to formulate arguments," Resolution Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (citations omitted), and even a generous reading by the Court cannot remedy Plaintiffs' briefing deficiency here. Their relative silence pales in comparison to their vigorous and detailed arguments regarding Dr. Summers' vertigo opinion. To the point, Plaintiffs offer no explanation or argument regarding the reliability and methodology of Dr. Summers' opinion that the mail truck incident caused Mrs. Thompson's rotator cuff tear. (See id. at pp. 9–10; see also doc. 23, p. 3 n.1.) Thus, even if the Court were to engage in the full Daubert analysis posed by Defendant's Motion to Exclude Dr. Summers' rotator cuff opinion, the Court would grant this portion of Defendant's Motion—which asserts the opinion unreliably rests on *post hoc ergo propter hoc* reasoning, because Plaintiffs have not established that Dr. Summers is qualified to offer an opinion as to the cause of the rotator cuff injury, and they have not established that his opinions on this issue are supported by a reliable methodology. Moreover, given the Plaintiffs' lack of argument, the Court would grant this portion of Defendant's Motion as unopposed. See, e.g., Brown v. J.P. Turner & Co., No. 1:09-CV-2649-JEC, 2011 WL 1882522, at *5 (N.D. Ga. May 17, 2011) ("Plaintiffs' failure to respond is in itself grounds for the Court to rule in favor of defendant." (citations omitted)).

below, Dr. Summers may not testify as a causation expert regarding this injury, despite his being

Mrs. Thompson's treating physician, because such testimony would exceed the scope of his

treatment and it was not properly disclosed pursuant to Federal Rule of Civil Procedure 26 ("Rule

26").

### (1) Legal Standard

Under Rule 26, "a party must disclose to other parties the identity of any witness it may

use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P.

26(a)(2)(A). Witnesses who are "retained or specially employed to provide expert testimony in

the case" or "whose duties as the party's employee regularly involve giving expert testimony"

must prepare a signed report to accompany the disclosure. Id. (a)(2)(B). This report must contain:

(i) a complete statement of all opinions the witness will express and the basis and
reasons for them;

(ii) the data or other information considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the
previous ten years;

(v) a list of all other cases in which, during the previous four years, the witness
testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the
case.

Id. In comparison, Rule 26(a)(2)(C) establishes a separate reporting classification for witnesses

who will testify as fact witnesses and will also offer expert opinions, a category into which treating

physicians often fall. While these witnesses need not provide the report required by Rule

26(a)(2)(B), they are still required to disclose the subject(s) of their expert testimony as well as a

summary of the facts and opinions on which they are expected to testify. Id. (a)(2)(C).

"Treating physicians not disclosed as experts are limited to testimony based on personal knowledge and may not testify beyond their treatment of a patient." <u>Rangel</u>, 202 F. Supp. 3d at 1364; <u>see also</u> <u>Goodman v. Staples The Office Superstore, LLC</u>, 644 F.3d 817, 826 (9th Cir. 2011) (requiring a written report from treating physicians who gave expert testimony beyond the scope of the treatment rendered and reviewed information provided by attorneys in rendering their opinions). As such, "[a] treating physician may be subject to Rule 26(a)(2)(C) as to portions of his or her testimony and may be deemed a retained or specially employed expert who is subject to Rule 26(a)(2)(B) as to other portions." <u>In re Denture Cream Prods. Liab. Litig.</u>, No. 09-2051-MD, 2012 WL 5199597, at *4 (S.D. Fla. Oct. 22, 2012). "Where the proponent of the treating physician's testimony fails to demonstrate such opinions were formed and are based upon observations made during the course of treatment, Rule 26(a)(2)(B) reports are required." <u>In re Denture Cream Prod. Liab. Litig.</u>, No. 09-2051-MD, 2012 WL 13008163, at *1 (S.D. Fla. Nov. 14, 2012) (citing <u>Goodman</u>, 644 F.3d at 826; <u>Meyers v. National R.R. Passenger Corp. (Amtrak)</u>, 619 F.3d 729, 734–35 (7th Cir. 2010)); <u>see also</u> <u>Kondragunta v. Ace Doran Hauling & Rigging Co.</u>, No. 1:11-CV-01094-JEC, 2013 WL 1189493, at *12 (N.D. Ga. Mar. 21, 2013) (Rule 26(a)(2)(C) report required when causation opinion formed based on treatment observations; Rule 26(a)(2)(B) report required when causation opinion formed based on facts gathered outside treatment or if it involves the use of hypotheticals).[5]

---

[5] The following excerpt explains the rationale and impact of Rule 26(a)(2)(C) as to treating physicians, and this interpretation has been echoed by many courts:

> [T]he disclosures that must be made for a treating physician depend on the nature of the testimony he or she will give. Unless the treating physician is going to be limited to testifying about facts in a lay person capacity, the physician must be disclosed as an expert and must provide either the summary disclosures or an expert report. Whether the treating physician must file a written report or is subject only to summary disclosures depends on the role of the expert. If the treating physician's expert opinions stay within the scope of treatment and diagnosis, then the physician would not be considered "retained" to provide

### (2) Whether Plaintiffs Complied With Rule 26

Plaintiffs implicitly acknowledge Dr. Summers was not disclosed pursuant Rule 26(a)(2)(B), but they argue that his causation opinion regarding Mrs. Thompson's rotator cuff injury is based on his firsthand treatment of her and should thus be admitted regardless of whether Rule 26(a)(2)(B)'s disclosure requirements have been met. (Doc. 21-1, pp. 8–9.) Plaintiffs contend Dr. Summers' opinion that the mail truck incident caused Mrs. Thompson's torn rotator cuff is permissibly limited to his observations and opinions obtained in treating her. (Id.) Further, Plaintiffs imply that Defendant was not unduly surprised by Dr. Summers' opinion because it was given in response to deposition questioning by Defendant's attorney. (Id.) Plaintiffs also point out that Defendant does not oppose the same opinion when offered by its designated expert, Dr. Mighell. (Id.) Defendant counters that, because Dr. Summers' rotator cuff opinion was not disclosed until the deposition, the opinion was necessarily developed "in anticipation of trial." (Doc. 23, p. 2.) Defendant also argues that, like with the reliability criterion, Plaintiffs do not seem to oppose this portion of its motion. (Id. at p. 3 n.1.)

---

expert testimony and only summary disclosures would be needed. But if a treating physician is going to offer opinions formed outside the course of treatment and diagnosis, then as to those further opinions the physician is being used in a "retained expert" role and the Rule 26(a)(2)(B)'s report requirement will apply to the extent of that further testimony. It is not sufficient for the summary disclosures to mention that the treating physician is going to offer these additional expert opinions.

The types of disclosures made will then determine the scope of testimony actually allowed. Treating physicians disclosed only as lay witnesses may testify only to lay facts. Treating physicians for whom summary disclosures are provided may opine on matters relating to treatment and diagnosis. If the treating physician files an expert report, then the treating physician may testify as a retained expert to matters that go beyond treatment and diagnosis.

1 Steven S. Gensler, Federal Rules of Civil Procedure: Rules and Commentary Rule 26 (2018).

The treatment of Mrs. Thompson's right shoulder injury following the mail truck incident proceeded as follows: she was taken to the emergency room at Memorial Health University by ambulance the day of the incident, November 24, 2014; the emergency department diagnosed her with a shoulder contusion but x-rays were negative for a fracture, and she was discharged with a referral to an orthopedist; on December 4, 2014, Mrs. Thompson presented to Optim Healthcare for further evaluation of her shoulder injury, and an MRI was ordered by Dr. Donald K. McCartney; the MRI, performed on December 12, 2014, revealed a massive rotator cuff tear; Dr. McCartney reviewed the MRI on December 16 and referred Mrs. Thomson to Dr. Wilson, a shoulder specialist; on December 17, 2014, Dr. Wilson himself reviewed the MRI, evaluated Mrs. Thompson's shoulder, and placed her in a trial of physical therapy with possible surgery contemplated down the line; Mrs. Thompson underwent periodic physical therapy and injections at Optim Healthcare through March 25, 2015, until she temporarily moved from the Savannah area to Florida; while in Florida, Mrs. Thompson's right shoulder problems persisted so she underwent total replacement surgery, performed by Dr. Mighell on June 22, 2015, which proved successful. (Doc. 15-5, pp. 5, 7–8; doc. 15-6; doc. 15-15, pp. 1–2; doc. 21-2, p. 2.)

During this time, Mrs. Thompson first saw Dr. Summers on December 9, 2014. (Doc. 15-7, p. 11). At that visit, Dr. Summers noted her shoulder x-rays were negative but that she had an upcoming MRI scheduled through Optim. (Id.) In addition to Dr. McCartney who ordered the MRI and referred Mrs. Thompson to his Optim colleague Dr. Wilson, at her next visit to Dr. Summers on December 16, 2014, he noted that he had also reviewed Mrs. Thompson's MRI, which showed a massive tear, and directed her to Dr. Wilson. (Id. at p. 10.) Mrs. Thompson reported back to Dr. Summers on December 19, 2014, and he noted that "she has been undergoing evaluation of her right shoulder with Dr. Wilson." (Id. at p. 9.) At Mrs. Thompson's December

22, 2014 visit, Dr. Summers noted that she still had a "fairly limited" shoulder. (Id. at p. 8.)  The next time Dr. Summers saw Mrs. Thompson regarding her right shoulder injury was on August 17, 2015, following her surgery by Dr. Mighell. (Id. at p. 12.)  He noted that "Dr. Mighell feels that she is making good progress with her therapy." (Id.)  Dr. Summers' contemporaneous medical records do not reflect any express opinion he may have had regarding the cause of Mrs. Thompson's rotator cuff injury. (See id. at pp. 2–12.)

At his deposition, when asked about his role in treating Mrs. Thompson's rotator cuff injury, Dr. Summers testified that he "did not provide individual treatment," rather it was his "job to see that [Mrs. Thompson] got to the right people and got care." (Doc. 15-8, p. 18.)  Dr. Summers noted that he was not "initially involved at all with her shoulder" and that she was in the care of Drs. Wilson and Mighell for this injury. (Id. at pp. 18, 30.)  Nonetheless, Dr. Summers testified at his deposition, for the first time of record, that the mail truck incident "caused or at least contributed to [Mrs. Thompson's] torn rotator cuff." (Id. at p. 26; doc. 23, p. 2.)

In reviewing Mrs. Thompson's course of right shoulder treatment, it is clear that Dr. Summers played a passing role, at most.  He himself admitted that he provided no individual treatment and only ensured that other doctors provided her proper care.  The medical evidence of record demonstrates a course of shoulder treatment provided by the emergency room at Memorial Health University, Drs. McCartney and Wilson at Optim Health, and Dr. Mighell in Florida.  Dr. Summers, on the other hand, had no firsthand role in the evaluation and treatment of Mrs. Thompson's torn rotator cuff.  Dr. Summers did not treat Mrs. Thompson's torn rotator cuff injury, much less reach a conclusion regarding the cause of that injury during the course of her treatment by other doctors.  As such, he may not testify as a Rule 26(a)(2)(C) expert treating physician regarding the rotator cuff injury.  Consequently, for Dr. Summers to testify on causation, Plaintiffs

were required to have disclosed him as an expert under Rule 26(a)(2)(B) and to have provided the necessary expert report signed by him. They did not and, thus, failed to comply with Rule 26.

### (3)    Whether Plaintiffs' Failure to Comply with Rule 26 Warrants Exclusion

Pursuant to Federal Rule of Civil Procedure 37(c)(1) ("Rule 37"), a court may exclude testimony from a proffered expert witness when the proffering party "fails to provide information or identify [the] witness as required by Rule 26(a)." However, a court does not have to impose sanctions if it believes the party's failure was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). When deciding whether to impose sanctions, courts consider the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of the party to cure the surprise; (3) the extent to which allowing evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation." Kondragunta, 2013 WL 1189493, at *7.

Plaintiffs do not explicitly contend that this error was either "substantially justified" or "harmless" but essentially imply as much by emphasizing that Dr. Summers was Mrs. Thompson's long-time treating physician, that Defendant was able to ask about the opinion at Dr. Summers' deposition, and that Defendant's designated expert agrees with Dr. Summers.[6] (Doc. 21-1, pp. 8–

---

[6] On this point, Plaintiffs argue that Dr. Summers' causation opinion should be admitted under Leathers v. Pfizer, Inc., 233 F.R.D. 687, 697 (N.D. Ga. 2006), which stated the black-letter proposition that treating physicians need not supply a Rule 26(a)(2)(B) report when testifying about the care and treatment of their patients. (Doc. 21-1, pp. 8–9.) Plaintiffs state, "Dr. Summers simply testified to his treatment of the patient and upon questioning [at the deposition], responded with his professional opinion . . . ." (Id. at p. 9.) Leathers, however, provides no support for Plaintiffs' proposed testimony of Dr. Summers, because the court there excluded the causation portion of a treating doctor's testimony that was not disclosed as required by Rule 26 (a)(2)(B): "Although Dr. Norvey was, in fact, one of Plaintiff's treating physicians, in substance Dr. Norvey's statement is not one of a treating physician—it is the statement of a retained or specifically employed expert under [Rule] 26(a)(2)(B)." Leathers, 233 F.R.D. at 698–99. A fortiori, given that Dr. Summers was, in fact, not one of Mrs. Thompson's treating physicians for her rotator cuff injury (as explained more fully in this Section), there are multiple reasons he may not permissibly testify as to its cause without complying with Rule 26(a)(2)(B).

9.) Looking to the factors identified above, it is not enough for Plaintiffs to contend that their failure to disclose Dr. Summers as an expert should be overlooked because he had been Mrs. Thompson's treating physician for years. His being her treating physician is not probative of what his deposition testimony would be and does not at all lessen the surprise Defendant faced at the deposition due to Plaintiffs' prior nondisclosure. Furthermore, Plaintiffs knew well in advance that they needed to provide medical evidence of Mrs. Thompson's rotator cuff injury and its cause, and they were aware that Dr. Summers might be a candidate to provide this testimony given his ongoing treatment relationship with Mrs. Thompson, yet they chose not to disclose him as such, not even after the deposition where he gave the challenged opinion.[7]

As to the ability to cure the surprise, Defendant had no prior knowledge that Dr. Summers would serve as an expert on the causation of Mrs. Thompson's rotator cuff tear—indeed the medical records produced by Plaintiffs would have indicated the opposite since they show others provided care for this injury—and therefore Defendant could not have been expected to be adequately prepared to cross examine Dr. Summers at his deposition. Moreover, Defendant did not have the benefit of an export report to assist with preparing for the deposition and conducting the cross-examination. That Defendant knew Dr. Summers was Mrs. Thompson's primary physician does not obviate the surprise to Defendant when he opined on matters unrelated to his treatment.

> It is not enough for Plaintiff[s] to argue that Defendant should not be surprised by Dr. [Summers'] expert opinion because he was listed as a treating physician. Defendant had no notice prior to Dr. [Summers'] deposition that he would provide any opinions [regarding causation] . . . . Prior to that deposition, Plaintiff[s] had not provided any disclosure regarding Dr. [Summers] and, thus, had not even hinted

---

[7] Parties must supplement disclosures or discovery responses when they learn that a prior response was incomplete or incorrect and the additional or corrective information was not otherwise known to the other parties during the discovery process. Fed. R. Civ. P. 26(e)(1)(A). With respect to expert witnesses, the duty to supplement extends both to information included in the report and to information given during the expert's deposition. Fed. R. Civ. P. 26(e)(2).

that Dr. [Summers] would testify about anything other than the facts regarding his treatment of [Mrs. Thompson]. This surprise defeats the purpose of Rule 26's expert disclosure requirements. Moreover, with no notice of Dr. [Summers'] opinions, much less the subject matter of them, Defendant could not have prepared to depose Dr. [Summers] on those issues.

Rangel, 202 F. Supp. 3d at 1366–67; see also Goodbys Creek, LLC v. Arch Ins. Co., No. 3:07-CV-947-J-34HTS, 2009 WL 1139575, at *3 (M.D. Fla. Apr. 27, 2009) ("[E]ven if a deposition of every expert were taken by Defendant as a matter of course, furnishing it with a woefully inadequate report adversely impacts upon its ability to prepare for and conduct the deposition.").

Although Dr. Summers' rotator cuff testimony parallels the opinion offered by Dr. Mighell, this fact shows that Dr. Summers' testimony regarding this opinion is of little ultimate consequence. To the extent Dr. Summers' opinion parallels Dr. Mighell's, it is unnecessary, duplicative testimony. Geico Cas. Co. v. Beauford, No. 8:05-cv-697-T-24EAJ, 2007 U.S. Dist. LEXIS 61379, at *12 (M.D. Fla. Aug. 21, 2007) (limiting duplicative expert testimony); see also Fed. R. Evid. 403 (authorizing courts to exclude testimony that "wast[es] time or needlessly present[s] cumulative evidence."). Moreover, to the extent it assigns a higher degree of culpability to the mail truck incident than Dr. Mighell's opinion does, this aspect of Dr. Summers' opinion actually exacerbates the surprise and prejudice exacted on Defendant by the failure to timely disclose the opinion. Without a proper Rule 26(a)(2)(B) report, Defendant would be unable to adequately probe any material differences between Dr. Mighell's and Dr. Summers' opinions. Furthermore, allowing Plaintiffs to cure their failure and provide an expert disclosure at this stage would disrupt the discovery process and this litigation. Expert reports were due in this case by September 14, 2017, discovery closed on October 30, 2017, and a fully-briefed partial summary judgment motion has been pending since January 25, 2018. (Docs. 11, 15.) To permit an expert disclosure at this late stage as to a witness known to Plaintiffs at the outset would undermine both

sides' interest in a prompt resolution and subvert this Court's scheduling orders, not to mention the Federal Rules of Civil Procedure. <u>See</u> <u>Rangel</u>, 202 F. Supp. 3d at 1367 ("allowing parties to obviate the need to provide Rule 26(a)(2) disclosures and reports by simply making their experts available to be deposed would render the Rule meaningless.").

For all of these reasons, Rules 26 and 37 compel the Court to exclude Dr. Summers' opinion on the cause of Mrs. Thompson's rotator cuff injury. In sum, because Dr. Summers did not treat Mrs. Thompson's rotator cuff injury, much less form an opinion regarding the causation of that injury during the course of treatment, he may not testify as a treating physician regarding its cause. Likewise, because Plaintiff did not provide a Rule 26(a)(2)(B) report for Dr. Summers disclosing his opinion regarding this injury's cause, Dr. Summers may not testify as an expert. His proposed causation expert testimony on this injury exceeded the scope of his treatment and was not properly disclosed under Rule 26(a)(2)(b). Accordingly, the Court **GRANTS** this portion of Defendant's Motion to Exclude Expert Testimony. (Doc. 15.) Consequently, the Court limits Dr. Summers' testimony to only the facts and observations he obtained firsthand during the course of his treatment of Mrs. Thompson.

## II.   Motion for Partial Summary Judgment (Doc. 15)

Defendant moves for summary judgment with respect to Plaintiffs' claim regarding Mrs. Thompson's vertigo condition. (Doc. 15, pp. 15–18.) Defendant argues that without Dr. Summer's expert testimony, or any expert testimony at all, Plaintiffs cannot muster the specialized medical evidence needed—as required by the FTCA and Georgia tort law—to show the mail truck incident caused Mrs. Thompson's BPPV. (<u>Id.</u>) In their Response, Plaintiffs contend partial summary judgment should be denied, even in the absence of Dr. Summers' opinion testimony, because a triable fact exists as to the causation of Mrs. Thompson's vertigo. (Doc. 21-1, pp. 11–

13.)  Plaintiffs submit that no expert medical testimony is necessary for the factfinder to find a sufficient causal link between the mail truck incident and Mrs. Thompson's vertigo.

### A.    Legal Standard

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  <u>FindWhat Inv'r Grp. v. FindWhat.com</u>, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u>

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  <u>See</u> <u>Williamson Oil Co. v. Philip Morris USA</u>, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  <u>Moton v. Cowart</u>, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  <u>See id.</u> (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  <u>Anderson</u>, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  <u>Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County</u>, 630 F.3d

1346, 1353 (11th Cir. 2011) (citing <u>Rodriguez v. Sec'y for Dep't of Corr.</u>, 508 F.3d 611, 616 (11th

Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party

only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact." <u>Id.</u> (citation and emphasis omitted).

###   B.      Whether the Evidence Shows a Genuine Issue of Fact as to the Cause of Mrs. Thompson's Vertigo

In support of a triable fact on causation, Plaintiffs point to the difference in Mrs.

Thompson's health after the accident as compared to her health before the accident:

> In the present case, immediately prior to the accident Mrs. Thompson had never
> experienced vertigo. Immediately following the accident, with no other known
> cause, with a traumatic injury, including a head injury, and appropriate testing to
> rule out other causes, she suffered for [sic] this condition. A triable issue of fact
> exists as to the causation of her vertigo.

(Doc. 21-1, p. 12.) Plaintiffs argue this change in Mrs. Thompson's physical condition, when

considered along with Dr. Mighell's unchallenged opinion that the mail truck incident caused Mrs.

Thompson's torn rotator cuff, presents sufficient evidence for the factfinder to consider whether

the incident also caused her vertigo. (<u>Id.</u> at pp. 12–13.) As discussed above, however, the onset

of vertigo some four weeks after the mail truck incident occurred is an insufficient basis for a valid

causation determination. This rather distant temporal relationship, alone, says very little about

what caused Mrs. Thompson to begin suffering from vertigo several weeks after the mail truck

incident. As evidence, it falls prey to the same *post hoc ergo propter hoc* logical fallacy that befell

Dr. Summers' proposed expert testimony in this regard. Finally, Dr. Mighell's testimony

regarding the cause of Mrs. Thompson's shoulder injury bears no relevance on the vertigo issue.

Moreover, without any expert testimony as to the cause of Mrs. Thompson's vertigo, Plaintiffs fail to carry their evidentiary burden. The liability of the United States under the FTCA turns on the law of the state where the alleged negligent act or omission occurred. 28 U.S.C. § 1346(b)(1); Stone v. United States, 373 F.3d 1129, 1130 (11th Cir. 2004). In Georgia, expert testimony is required in a negligence claim if "the existence of a causal link between the defendant's conduct and the plaintiff's injury cannot be determined from common knowledge and experience and instead requires the assistance of experts with specialized medical knowledge." Cowart v. Widener, 697 S.E.2d 779, 784 (Ga. 2010). The plaintiff must submit expert evidence to survive a motion for summary judgment "where 'medical questions' relating to causation are involved." Id. In this case, the cause of Mrs. Thompson's vertigo poses a medical question, and Plaintiffs have put forth no admissible expert evidence on this issue.

Plaintiffs attempt to analogize the question of what caused Mrs. Thompson's vertigo to more straight-forward and obvious causal relationships. For instance, Plaintiffs point to injuries such as death from a gunshot wound to the head or from internal bleeding in the head following a slip and fall where the decedent struck his head. (See Doc. 21-1, pp. 11–12 (citing Cowart, 697 S.E.2d at 784).) These obvious causal relationships differ significantly from the cause of a medical condition like vertigo. Plaintiffs contend that, because juries can find causation without expert testimony "where the symptoms complained of emerge immediately or soon after the event alleged to have caused them, and it is common knowledge that such an event is one that could cause that kind of injury," Bruce v. Classic Carrier, Inc., No. 1:11-CV-01472-JEC, 2014 WL 1230231, at *7 (N.D. Ga. Mar. 24, 2014) (citation omitted), a triable fact exists as to the cause of Mrs. Thompson's vertigo. (Doc. 21-1, pp. 11–12.) However, Mrs. Thompson did not experience vertigo until at least four weeks after the mail truck incident. Moreover, it is not common knowledge that such

an event could cause vertigo. Indeed, Dr. Logan, Plaintiff's treating otolaryngologist stated that a "large percentage of people [with BPPV] are idiopathic," meaning they experience the condition spontaneously or without a known cause, and he noted that difficulty exists in determining the cause of a particular patient's BPPV. (Doc. 15-9, pp. 24–25.) Thus, Plaintiffs may not create a triable issue of fact under the general principle recited in Classic Carrier. See, e.g., Teegarden v. Countrywide Home Loans, Inc., No. 08-00973-CV-W-SOW, 2010 WL 11590726, at *5 (W.D. Mo. Mar. 12, 2010) (plaintiff's injuries, including vertigo are "'sophisticated' and require expert testimony to prove causation."); Pihsiou Hsu v. Mound Yellow Cab Co., 624 S.W.2d 61, 63 (Mo. Ct. App. 1981) (plaintiff's testimony that she experienced vertigo following car accident without expert medical evidence linking the complaints to the accident was insufficient to prove causation).

The record here—as further explained in the above discussion of Dr. Summers' proposed expert testimony on this point—demonstrates that the cause of vertigo is a medical question, for which expert testimony is required. As Plaintiffs have not produced any admissible expert evidence on the cause of Mrs. Thompson's vertigo, they may not seek to recovery at trial for Mrs. Thompson's vertigo or any damages related to it. Accordingly, the Court **GRANTS** Defendant partial summary judgment, (doc. 15, pp. 15–18), specifically as to Plaintiffs' claim that the mail truck incident caused Mrs. Thompson to suffer vertigo and also as to Mr. Thompson's claim for loss of consortium related to or resulting from Mrs. Thompson's vertigo.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant's Motion to Exclude Expert Testimony and for Partial Summary Judgment. (Doc. 15.) Plaintiffs may not rely on Dr. Summers to offer expert testimony on the cause of Mrs. Thompson's vertigo or on the cause of her torn rotator cuff injury. Further, Plaintiffs may not proceed in this case on the theory that Defendant's alleged negligence caused Mrs. Thompson's vertigo or seek any recover for such injury including Mr. Thompson's claim for loss of consortium related to or resulting from Mrs. Thompson's vertigo. Plaintiffs' remaining claims related to Mrs. Thompson's torn rotator cuff remain pending before the Court.

**SO ORDERED**, this 9th day of January, 2019.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA